and     and V and V and V and V and V and V and V and V and V and G and G and G and G and G and G and G and G and G and     G and G and G and G and G and G and G and G and G G G G G Sw Sw Sw Sw Sw Sw Sw Sw Sw Codeus figure 2, the figure in the patent, the figure that supports the asserted claims, shows a timing difference, various timing differences, along the lengths of the various data buses and control and timing signal buses. Second, Codeus figure 2, if read as a physical implementation, has various inconsistencies in it. Third, the Codeus disclosure explicitly explains that there is the same enablement period for each of the memory devices. What that means is that each of the memory devices receive a clock signal at the same time. Well, that's assuming that we accept your definition of enablement period. ALJ made specific findings with respect to what he believed enablement period meant, and our review is limited to substantial evidence review on that issue, isn't it? That's correct, Your Honor. The Codeus specification is clear in that regard. If you look at, for example, figure 4E of the Codeus patent, figure 4E shows a write operation, a write operation to multiple memory devices. And what Codeus says is there, there is, quote, an enablement period of the collective DRAMs. That enablement period is shown in figure 4E as starting at time T2 and ending at time T4. By starting at time T2, the clock signal reaches each of those memory devices at the same time. That is supported by the disclosure of an enablement period of the collective DRAMs. The same is true with respect to the read operation, and that's shown in figure 4A. Figure 4A shows the controller side and registers on the controller side. So the question is, what do these figures teach, correct? The figures teach- That's the bottom line question is, what do these figures teach? The figures teach- And that's a fact question. The figures- And the review standard here is substantial evidence. That's correct. And that substantial evidence review standard is, is it not that reasonable minds could differ? It is, Your Honor, but based on the disclosure, reasonable minds cannot differ. Don't you have to show that the ALJ's reading of the references was unreasonable? Yes, Your Honor. If I take the standard of review faithfully. Yes, Your Honor, and we believe that it is. Why is the- why then is the ALJ's reading of the figures unreasonable? Well, let me turn back to figure 2 and start there, and that was the start of the ALJ's analysis. Figure 2 shows various lines and buses in a controller system connected to memory devices. What figure 2 shows is a number of data buses, write data buses and read data buses. And they're labeled on the figures as 104A and 105A. And what Codius explains is that he wants to compensate for differences between different ones of those buses. There's data buses that reach each different memory device. And Codius says that he wants to compensate for differences between the lengths of those different buses. But figure 2 shows those buses having the same length. So that difference isn't shown in the figure. The same is true with respect to the controller clock buses. And those are shown as items 11B1, 11B2 in Codius figure 2. Even if your argument supports the theory of anticipation, would you discuss the alternative holding of the ALJ on obviousness? Yes, Your Honor. The obviousness determination does not stand either. The commission, reaching the question of obviousness, the rationale for finding obviousness was there was increased speed. And that increased speed would have led one to conclude that changing the topology or compensating for timing differences on a shared bus would have been obvious. But the evidence does not support that conclusion. In fact, the evidence relied on by the commission was the testimony of NVIDIA's expert. And what NVIDIA's expert said was that clock speed had nothing to do with implementing a fly-by topology. But isn't that within the authority of the administrative judge to rely on one expert's over another's? But the expert does not support the conclusion. The rationale was that clock speed would have made it obvious. But NVIDIA's expert said that changing the topology had nothing, that clock speed had nothing to do with changing the topology. He further said that the fly-by topology is not speed dependent and further that it's irrelevant what speed you're running at. So increased speed at the time of the Ware invention, according to NVIDIA's own expert, had nothing to do with changing the topology. Moreover, at the time of the Ware invention, it was recognized in the industry that clock line lengths to different memory devices were to be the same. And that's shown in various specifications from the time. The IBM specification explains. IBM, the Codeus S&E, explains that clock line lengths to memory devices were to be the same. And NVIDIA's expert agreed with that. An Intel specification at the time explained that clock line lengths to memory devices were to be the same. And NVIDIA's expert agreed with that as well. I thought what NVIDIA's expert actually said was the intent of this figure is to provide the system layout and also provide information related to the architecture of the interconnections, not the specific lengths, but how they are related to each other in terms of their routing. If that's what he said, how can you argue now and in your blue brief that he said the opposite? Well, with respect to figure 2, figure 2 should not be read as showing a physical implementation for lines 102A and 103A. But that wasn't my question. Yes. You're telling us what their expert said, and yet when I look at the expert's testimony, he really didn't say what you're claiming. He said the opposite. So, I mean, are you now backing off of your reliance on their expert and making an alternative argument? Or are you telling me that I'm misreading the expert's testimony? No, Your Honor. With respect to the commission's rationale for obviousness, what the commission said on obviousness was that an increase in speed would have made changing the topology obvious. That is not supported by the expert's testimony. With respect to the testimony that you're referring to with respect to figure 2, NVIDIA's expert agreed that figure 2 does not show a layout. But what NVIDIA's expert said was that figure 2 shows an architectural representation or conceptual drawing. And the reason that's problematic and is not substantial evidence to support the holding is that what that means is you need to ignore some parts of the figure while you adopt as a physical implementation other parts of the figure. By calling it an architectural drawing, whatever that means, you ignore the fact that the data bus lines are said to be of unequal lengths but are shown in the figure as having equal lengths. It requires ignoring that the clock lines on the controller have equal lengths but are shown in the drawing as having unequal lengths. But as the presiding judge pointed out, I think it's what she was saying, that that might matter for a 102 analysis but may not be dispositive for a 103 analysis. And I didn't understand you to be saying with regard to figure 2 that there's an inconsistency in NVIDIA's expert witness, right? Your Honor, I think under either anticipation or obviousness requires looking at figure 2 of the Codeus patent in a consistent way. One of skill in the art wouldn't approach that figure and accept some lines of the drawing as being an actual physical implementation and other lines as not. And in fact, when asked why that was so or how to accept that in the figure, NVIDIA's expert said, well, graphically it works out that way, well that way, to draw the lines so that the data paths are shown to have equal lengths even though they have unequal lengths. As the Commission said in its briefing, it's a matter of convenience how to draw the lines in figure 2. But the lines in figure 2 have been very important to the analysis and taking as a physical implementation the clock line and the control line in figure 2 while disregarding everything else is inappropriate. It is also inconsistent with what was known at the time. The Ware patent itself recognized that there were timing constraints and there were physical constraints on systems at the time of the invention. And those constraints were that the clock line lengths were required to be equal. The evidence supports that in the IBM specification, the Intel specification, and even the standard at the time. Much later, in 2007, a new standard was adopted, the DDR3 standard, and that's the standard by which the infringing products operate. That standard recognized a fundamental topology change, and that fundamental topology change was to have clock line length differences on the shared control path, recognizing it as a fundamental topology change. If the CODIUS patent intended to adopt what was later recognized as a fundamental topology change, it would have said that. But the ALJ also referred to figure 3C, for example, as being more explicit. What is your response to that? Well, figure 3C and other figures in the CODIUS patent address the timing adjustments that the CODIUS patent addresses. And there is no doubt that the CODIUS patent does address making timing adjustments, but the timing adjustments that CODIUS makes are very different from the timing adjustments that are claimed. The timing adjustments in CODIUS are to adjust for differences in length between different buses. As I mentioned earlier, there are multiple data buses going to each of the memory devices, and what CODIUS does in his adjustment is adjust for differences in the lengths to the different buses. What CODIUS also says is by maintaining the same enablement period for each of the memory devices, the clock signal, even in those adjustments, even when making those adjustments, will reach each of the memory devices at the same time. So CODIUS is addressing a fundamentally different problem than it is addressed in the WARE patents. WARE addresses timing differences along a shared control path, while the CODIUS patent addresses timing differences along multiple different data paths. But the reality is that the administrative judge found that the delay elements are programmed by an algorithm that is based, at least in part, on the propagation time of a clock signal and on a shared clock path to each individual memory device. That's what the ITC relied upon. In other words, they made fact findings about how the timing and the length relate that are different than the ones that you're urging on us. And, Your Honor, we submit those findings are not supported by substantial evidence because they are contradicted by what CODIUS actually teaches. CODIUS teaches that in a successful write operation, there is a same enablement period for each of the memory devices, and by a same enablement period, that means that the clock line lengths need to be the same. That's supported also by CODIUS Figure 8. CODIUS Figure 8 is a prior art figure and shows the clock line drawn in the exact same way as the clock line in the invention of CODIUS. And in the prior art as well, in explaining that prior art Figure 8, there is a same enablement period. CODIUS never intended to change how the clock line was distributed to memory devices. He intended it to be the same, and that's shown by the consistency of what he discloses in the prior art and what he discloses when describing his invention. Any other questions at this stage? Thank you. We'll save everybody time. Raise hands. Mr. Rosenzweig. May it please the Court. All we have here in dispute that I've heard is a contention that the Commission should have relied more on Rambis' expert's testimony rather than NVIDIA's experts. The Commission found NVIDIA's expert more persuasive and more credible, and from the Commission's perspective, that's the end of Rambis' argument with respect to the CODIUS patent. CODIUS Figure 2 discloses each and every limitation of the asserted wear patent claims. The wear patent claims require a shared control path coupled to memory devices at a different point along its length, and as reprinted on page 16 of our brief, that's exactly what the CODIUS figure shows. It shows the control line starting at the top, going to the bottom, and terminating, stopping serially. There are small differences. In this complex technology, aren't small differences more likely to be significant than not? Well, we look to the limitations of the claims, and the small differences here, Your Honor, respectfully, are not pertinent to the claims. What we have in Figure 2 is we have a shared control path with a different length of path to each memory device, and we have a system where there's no dispute that the actual calibration system of CODIUS will compensate for such different length to each memory device. The only dispute is whether a person of ordinary skill reading Figure 2 would reach the conclusion that CODIUS discloses a system, could be among many different systems, but at the very least discloses a system with a shared control path with a different length to each memory device. You mentioned NVIDIA's expert, and that the ALJ relied more on that than on Rambis' expert. What's your response to Ms. Hines' argument that the NVIDIA expert testimony actually doesn't support the fact conclusion of the ALJ?  It was in a footnote. I'd have to get it. The issue arose before the commission because this is— are you asking about the speed of the devices or— You're saying you're dealing with this in a footnote? Yeah, hold on. Okay. Ms. Hines thinks the point is dispositive. This was our brief at page 46. Rambis' grievance about the ALJ's mention of increased clock speeds selectively and misleadingly quotes from the transcript. Respondent's expert testified that as you go to higher clock speeds, you're more susceptible to the same effect, that for a fly-by configuration, the need to compensate for bus length differences increased as clock speeds increased.  is because Rambis' expert contended that a person of ordinary skill would interpret a multi-drop device to be something that looked rather like this system, but where the control signals reached each memory device at essentially the same time. So what this testimony supported was the idea that as clock speeds increased, essentially the same time takes on a different meaning. What might be good enough and close enough for purposes of a very slow system are not good enough and fast enough for a much faster system. Now, that only goes to the issue of obviousness, and we contended not to the commission's findings of express anticipation, and as the ALJ put in a footnote in his initial determination, inherent anticipation as well, because what CODIUS does not disclose is a system with multiple buses connecting the controller with the memory devices. We've heard a lot about the enablement period from Ms. Hines, and that too is an issue that was contested at the commission, and NVIDIA's expert at pages 11192-93 and 11203-04 explained that an enablement period is for each particular module, and there are a lot of references in the patent specification to the enablement period, and we contend that Rambis is selectively choosing ones that appear to support it, but in the greater context of the patent's use of enablement period, the commission agreed with NVIDIA's expert that the enablement period is not what is contended by Rambis, but in any event, it just doesn't matter, because even if they were right, and even if the CODIUS patent disclosed an embodiment to a person who read it all really carefully, where the enablement period was the same and hypothetically figure two would have been drawn differently to best capture the preferred embodiment of CODIUS, it also discloses something else, which is the drawing in figure two, and a reasonable person of ordinary skill in the art, as NVIDIA testified and provides substantial evidence about, would read CODIUS figure two to disclose a single shared control path, stopping serially along the memory module, and there's no dispute about that. Before your time runs out, can I ask you a couple other questions about some of the other issues? Sure. In terms of the crime fraud exception and the piercing of the attorney-client privilege, it's unclear what law was being applied. Are we to assume that it was California law that was being applied? Well, yes. I mean, that's consistent with the Micron and Hynek's decisions. Though this occurred before those decisions came out. This occurred before those decisions came out, but the document destruction factually was the same. It was the same course of conduct that Rambis engaged in in California and for the same reasons that the district courts had the authority under California law to pierce, as did the commission. It would have helped if we had cited that perhaps, but the factual circumstances are the same. With respect to privilege, we would just like to note that Rambis' argument appears to be an improper collateral attack on previous district court judgments where privilege was pierced. All of the documents that are in dispute were sought by NVIDIA, were produced by Rambis in earlier proceedings. At page A70 of the appendix, the ALJ referred to an Exhibit 56 from NVIDIA's reply on the issue of privilege piercing, and it's not an exhibit that was presented as part of the appendix before the court, but it's a list, it's a privilege log of all the documents that are in dispute. I have copies if the court would like to see what the documents are. These were all documents that were produced subject to privilege piercing in other cases, and it's not up to the commission or up to the court here as a collateral attack to restore privileges to documents from earlier proceedings where privilege was lost. And even if it now were appropriate to hear Rambis' complaint, notwithstanding the fact that privilege was properly pierced in other cases, the commission contends that its argument still fails because the privilege-piercing decision here is committed to the commission's sound discretion under Micron and Hynex. We may return to that issue on the next appeal as well. Okay. Thank you, Your Honor. No, not yet. Mr. Davis has the podium. May it please the court. With the court's permission, I'd like to spend just a few minutes on the Ware and Codius patent and then address the domestic industry issue that we've briefed here, which, of course, applies to the cases that we'll be talking about subsequently. The ITC, I think, correctly puts the focus on the claims. The question really before the court on the Ware and Codius patent is, are the Ware claims disclosed or taught to the public already by the Codius patent? And for me, the most accessible way to see that is the Figure 2 that we've been talking about. So we have to look at what Ware Claim 7 says and compare it to Figure 2. And Ware Claim 7 has the control transmit circuitry, the controls going down the line, the information jumping off as it goes down the line, and it requires timing circuitry. The data transfer has to sort of be sequenced properly and has to take account for that delay. And when you look at Figure 2 that we were talking about previously, that's exactly what it shows. It has what in our brief is a yellow line in the control circuitry coming down, and it goes to the memory device, goes first, second, third. And anyone knows that that is going to take some amount of time. And that is what the picture shows. And so when Ware claims control transmit circuitry with a shared control path that results in timing differences, Figure 2 has to show that. And the fact that it doesn't say exactly how much distance is not the point at all. The fact that at any distance, any sequence, it's going to take time for the data to flow. And then we need to have some way for the system, this complex system, as you ought to notice, to deal with that delay, and that's the delay signals called delay, 15A and 16A, and those, as the patent explains, compensate for that delay. And the fact that this Clio drawing is not gumbled up with more signals is just a function of the physical reality that the memory controller is very, very small and the DRAM devices, the DIMM, is much larger. And so when they wanted to do a figure to explain to the public what we're talking about in this invention, the memory controller piece was blown up. And so there wasn't any point in spinning it out any further because everybody knows that it's just an iteration. So to me, the Figure 2 and the claim are more than the facial differences that Ms. Hines referred to. They are, in fact, dispositive. So I see we've exhausted ourselves on the wear of a courteous pen. May I raise the domestic industry issue, Your Honor? Yes, please. I think it's common ground between us and actually everyone at the table that the domestic industry issue is the same in both cases, and we've briefed it here. So the domestic industry issue... When you say it's the same, meaning that it's the same in the sense that you argue that the standard should have been different, or it's the same in the sense that you believe that the factual showings were essentially the same? More the latter, Your Honor. If you agree with us that when Congress said substantial investment has to be tied to the licensing concerned, the factual record is indistinguishable between the two cases. Did the factual record show what the licensees, what the domestic licensees did with their license? That is, did they produce or manufacture under the license in the United States or import the licensed products? There is no evidence, Your Honor, in the record that ties these Ware patents or the Barth patents to any human endeavor. It is true. There was a lot of money spent by Rambis on licensing as a general matter, and certain licenses include the Ware patents, but that just shows the link. It doesn't show that anybody's actually engaged in the type of productive behavior that Congress wanted when it authorized people to establish the right to come to the Trade Commission. Would it be possible to practice the industry standard technology without stepping on these patents? According to Rambis, no. Are they right? Pardon? Are they correct? I thought Rambis' argument was that you couldn't actually, under the technology license, you couldn't perform up to the industry standard without necessarily infringing the Ware patents. But even if we take that, Your Honor, as true. Okay, let's say that. Let's say that's true. That doesn't show that Rambis has employed people. But we know the dollar figure associated with the technology licenses, right? I don't know whether we're allowed to say that in open court, but it's quite a lot. It's substantial, but what we don't know. And would you agree that that's substantial in terms of the test under the statute, The amount of money. If that amount of money was paid for one patent, it would be substantial, no question. But we don't know, and certainly there's no finding by the ALJ that that amount of money was paid for these Ware patents. Rambis has over 600 patents. Rambis licenses are, you can produce the product, but we're not going to tell you exactly which patents. Well, someone who takes the license, who wants to practice the license, wants to make something that will comply with the industry standard, that's what they want to do, and if the next piece of the equation is if you do that, you will infringe the Ware patents. Doesn't that connect the Ware patents up to the technology license? Yes, Your Honor, that's the key. It connects it, but it doesn't provide a substantial investment. So that's the pioneer case that the ITC recently decided. Now you're talking the dollar amount. Yes, exactly. The dollar amount is fundamental. So somebody paid a hunk of a million dollars in order to take technology licenses that if they practice the license they will infringe the Ware patents. There's a dollar sum in the record that's associated with these technology licenses. Yes, exactly. It's associated with the licenses, but not with this particular patent. That we don't know. The ALJ certainly didn't say that that amount of money is connected to the Ware patents, and the ITC recently declared that's not enough. There are occasional references in a licensing presentation, Your Honor, that prompt someone to provide money. What are you relying on for the ITC standard now, Garmin? We're relying on the statute most fundamentally. What we found very persuasive, Your Honor, was that... You didn't really rely on the statute. Was there any attempt to discover the sort of information that we're talking about or to discover what the domestic industries may or may not have done with these licenses? Well, Your Honor, it's certainly Rammus' obligation to establish they've met the statutory criteria for invoking the authority of the trade court. It was decided in their favor, so that... Oh, right. Yes. The domestic industry aspect, so that they met their obligation. Well, no, no. But our position is that it was incorrectly decided on this record, that Rammus has the obligation to provide evidence that they meet the trade commission statutory requirements, and one of those is substantial investment. You have to take the statutory requirement that the commission had in place at the time Rammus was required to meet the test, right? No. With respect, Your Honor, no. Because the commission was not requiring evidence of production in the United States, right? Whether or not that's true, Your Honor, the statute controls the ITC. Doesn't the string musical instruments case say flat out that you don't, with regard to the licensing, you don't need to have evidence of production in the United States? The ITC had sent mixed signals. I agree with that, Your Honor. But the ITC cannot ignore the statute. It says substantial investment to the patent concerned. The patent concerned here is the Ware patent, Your Honor. There's no evidence in this record, certainly no evidence that the ALJ found a substantial investment in these patents. So you're not arguing that they have to show that someone's actually practicing the patents? The statute doesn't say practicing, Your Honor. It says substantial investment. So assuming that all they have to do is have licensing, even if it's just revenue-generating licensing, are you arguing that the Garmin test from that additional authority that was sent to us is the one that we should be adopting? The 694 opinion, Your Honor, is persuasive and useful because what it says is that occasional references, when you have a portfolio license like we're talking about here, that occasional references are not enough. What Congress wanted here was to give people an incentive to exploit licenses. They didn't want patents sitting in a drawer. It doesn't say that. The statute says domestic industry. To the extent that precedent may have interpreted that, to be satisfied by licenses really has to be the position. The statute says domestic industry, and the history of that statute is quite clear that they're talking about industry. Absolutely, Your Honor. The statute says substantial investment in licensing. The patent concerns. So the question you have to decide is whether on this record there is substantial investment, not generally, not in a portfolio, but in these wear patents or in these bark patents. Has Rambach shown the jobs, the trades affected by these patents? There are other patents in the record where they have emphasized them, gone into licensing presentations, and clearly put a lot of— Help us out a little bit. Tell us what you think would suffice. For example, if there had been testimony in the record, a particular licensee who took one of the technology licenses got on the stand and said, we paid X for the license, which is hypothetically a million bucks. And our judgment, $480,000 worth of that money was in there because we realized that we might be practicing the wear patents. That's a lot closer, Your Honor. The only quibble I would make is something that the 694 opinion also emphasizes, is that how much you get is only somewhat evidence of how much you've invested. I can invest a lot and get no return, or I can invest a little and get a lot of return. If I get a lot of return, that's not really showing. In terms of adding up to get to this economic number, that's because your point is the dollar sign, because you're not arguing the production requirement. It's not substantial. How about home office? How about expenses like salaries and overhead and all of the money that Arambus spends in its licensing department? If they can somehow tie that, which would probably be easier on the record because they've got the internal records, that would be pertinent? Absolutely, Your Honor, because that's the type of jobs, that's the type of effort that Congress is trying to facilitate. Your argument with regard to those expenditures, which I think I'm not supposed to say the numbers, but they were large, you're saying that evidence that Arambus put forth is no better than the evidence they put forth with regard to the licenses, because it doesn't tie back to the patents. Thank you, Your Honor. That's well put. Thank you. What about the fact that these are technology licenses rather than patent portfolio licenses? You focus, at least in your opening brief, exclusively on this concept of patent portfolios, but this was a technology portfolio, and admittedly the licenses were entered into at least before some of these patents were issued. But given that in order to practice the technology, at least Arambus argues that he would have to step on the toes of these patents, wouldn't that be enough? No, for a couple of reasons. First, when you get a technology, these technology licenses came with a whole bunch of designs, like teaches how to make the product that Arambus has created. So all this large amount of money could well have been for actually the know-how, independent of any value placed on patents. Second, it's still not clear which patents were motivating people to provide that money. There's a gap in connecting up the funds for these licenses with these where patents or later with the BART patents. It could be that one patent alone on a particular feature is what the people wanted to practice, and the where patents just happened to come along with the license, but nobody really plans to do that feature. What was the law at the time this case was tried before the ALJ? What was the commission law with regard to the need for specificity in tying dollars to a particular patent? I see what's troubling, Your Honor. Some sort of shift has occurred, and you think that maybe... That's why I'm asking the question. I'm afraid my answer is the same, that the law that Congress enacted has not changed, and if the ITC is misreading the statute... You're saying then that the commission's previous interpretations, which might well have led Arambus to believe that its evidence would be sufficient, doesn't pass the Chevron test. That's what you have to say. Well, that's one thing we say. No, because the commission's interpretations are entitled to deference if they're reasonable, if there is ambiguity in the statute. Absolutely. So one thing we say is there is no ambiguity here that the substantial investment test was not met. Do you think a statutory language requires specific dollars tied to specific patents? I have a second point, but, Your Honor, yes. How do you get that out of the statutory language? Just as the ITC got it out of the language in the 694 opinion we submitted where it says substantial investment in licensing the patent concerned. So you have to have, by statute, a link between the substantial investment and the patent. It doesn't say the portfolio. The patent concerned. There are other provisions, other ways to get to the ITC. If you have a big company and you have a lot of patents and you have a lot of employees, there are other provisions. But for this provision, Congress really had in mind universities with licenses not being properly exploited, not creating American jobs. They wanted you to go out and use those patents. Substantial investment, we will let you come to the ITC. So it is a matter of Chevron step one. But I don't want to concede the point. There are other decisions, the ones we cited. Our opening brief was filed before the 694 opinion. The coaxial cable, which this Court just affirmed, is very clear that you need a clear link. So I think it was mixed. It was a mixed bag. And it's also, as we also pointed out in our brief, there were tactical reasons for Rambis not to emphasize the license payments here, not to link them up, because then that creates a problem for them on exhaustion for a sale. So it's not like they got unfairly caught. There were opinions out there pointing the way. They had strategic reasons to take advantage of different ones. But the fundamental one is the statutory one, and that the ITC can't run away from. Just so I have your argument at hand, your argument is really pitched entirely on the dollar sign, on the substantial investment, the amount of money and the lack of specificity in time, or even a very large sum of money to a particular patent. You're not arguing a production requirement. Thank you, Your Honor. That's exactly right. It's by statute. Are you familiar with string musical instruments? I think so, but that's the ITC opinion. Well, with regard to paragraph 3, subparagraphs A and B, there is a production requirement. But with regard to C, there's not. Yeah, and that's the point. I mean, when Congress put in C... Well, they put in A, B, and C at the same time. Yes, but C is about licensing, exploiting the patents. It says substantial investment... Well, it's about engineering and research and development. Sure, but they haven't... I understand. I mean, you can build an industry on R&D alone, can't you? Absolutely, absolutely. But Rambis is not doing that. I understand. We may be better off if they were, but what they're doing is trying to get licensing revenue out of the patents. Can you help me with just interpreting the statute? Because subs 2 and 3 came in in 1988, correct? I believe so, Your Honor, yes. Yeah. Basically, the way it's set up, it says, you know, there are illegal acts and importing and infringing articles is an illegal act. And then paragraph 2 says, you know, importing is illegal if an industry in the United States relating to the articles protected exists. That's 2. 2. Subsection, it's, you know, number 2. As far as it's being established, yes. And then it goes to number 3 and says, for purposes of paragraph 2, are 2 and 3 separate tests? Do you have to meet both tests? Or is 3 a way of saying how you meet 2? I've always read it the latter, Your Honor. It says, for purposes of paragraph 2, so 3 is really a subset of 2. Because to the extent that you thought that paragraph 2 was a separate test, then there'd be a little stronger argument that production might be required with regard to licensing. Yeah, I haven't never thought of it in terms of production. I'm not a... Well, the language says articles. Well, the law to which Judge Newman referred is clear to those of us that have lived with this. In the beginning, there was, in essence, a production requirement. If you wanted to get into 337 and you had a patent, you had to show that you had bricks and mortar and you were doing something significant in the US economy other than generating dollars. Right. And 1988 came along and sought to change the law by making clear, at least, that licensing revenues could count. But it was a little unclear as to whether or not the production requirement was entirely gone. And the commission has chosen to say that the production requirement is gone when it comes to licensing. I must say, I never read it that way. It's interesting to observe the evolution. I always thought that the purpose of the third subparagraph was to give standing to the inventor, to the licensor, not to say that licensing overseas, let's say exclusively overseas, suffice. We'll see if we get to this or not. Okay, any more questions at this stage? Before you sit down on this topic, that last statement that Judge Newman made, I think, is an important one. And that is, because this is a threshold issue in both instances, do we have to get to it if we otherwise conclude that the patents are either invalid or because of spoliation that they're unenforceable? Reluctantly, I think you do. Because we've looked pretty hard at that. Because obviously we won on the Ware patent. I think you're probably right. I think you do. Is it because it's a jurisdictional issue? Yeah, I mean, I think that's the best way to think about it. Because they gave jurisdiction to the ITC. This court's jurisdiction is based on, you know. We will have to think about that. I'll be interested to see what the ITC has to say. OK. And so would you enlarge Ms. Hines' time by patents? 13 minutes, plus the three that she had. 14 minutes. That makes 20. I don't know if you need all that time. Your Honor, I don't. Mr. Jakes is going to be addressing the domestic industry issue. I'd like to come back to the Ware patents and the validity issue and just make a few follow-up points. Counsel said that anyone would know, from looking at Figure 2, that there are timing differences along the shared control path in the Codeus patent. And we respectfully submit that's just wrong. Because the lines are the same length? Well, because that requires inconsistently interpreting Figure 2, yes. Because the data path lengths are shown to be equal when they are not. And the Codeus patent is clear that they are not. And the analysis that anyone would know that we submit is based on hindsight. It's classic hindsight, based on what was much later disclosed, not only in the Ware patent, but in the DDR3 specification itself. The DDR3 specification came out and said there's going to be a fundamental topology change in these products. And that fundamental topology change is these systems are going to compensate for timing differences on shared control paths. And that's what they do now, and that's what NVIDIA's products do, and that's why they infringe. Looking at Codeus Figure 2 and reading that in to the figure is exactly what happened. And it's what happened from the start. NVIDIA moved for summary judgment and compared a cropped and rotated portion of Codeus Figure 2, showing just those two lines, line 102A and 103A, and comparing it to the DDR3 standard, and a picture from that standard and saying, see there's two lines that are shaped like an L. They must disclose the same thing. That ignores that Codeus does not talk about timing differences. And it also ignores that the DDR specification says it is fundamentally different because it addresses those timing differences. Well, the mere fact that the DDR specification says that doesn't make it so, does it? Just because they say. The DDR3 specification is what is required. It's required for implementation of these products. And that specification explains that there are timing differences on the shared control path and that products must have that and must compensate for it. But the fact that they're requiring that for products or saying that that's the standard does not mean there wasn't ever any patent out there that otherwise disclosed it, does it? Well, not necessarily, but here Codeus doesn't show those timing differences and doesn't explain that they exist. So comparing two figures is really a conflation or incorporation of what is in the standard, what is in the where patents, into Codeus when Codeus is silent on the point. So what may be apparent today with respect to how these products work is not apparent from just two single lines drawn on figure two, not supported anywhere else in the specification saying that there are these timing differences that you must now account for. Thank you. Okay. Thank you. Thank you both. All three. This case is taken under submission and we'll proceed with the next case. I think you can stay put. We will figure out who's the. We have then, we've combined for argument, the dockets number 2010, 1556, and 1557, the first captioned ASUSTEC computer against the ITC and the second NVIDIA corporation.